IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| HOST INTERNATIONAL, INC., § § Plaintiff, § § v. § § MARKETPLACE, PHL, LLC § § Defendant. § | Civil Action No. _____ JURY TRIAL DEMANDED |

## ORIGINAL COMPLAINT

Plaintiff Host International, Inc. ("Host"), based upon personal knowledge as to facts pertaining to itself, and otherwise upon information and belief, hereby asserts the following claims against defendant MarketPlace PHL, LLC ("MarketPlace").

## NATURE OF ACTION

1. Host asserts claims under Section 1 of the Sherman Act, 15 U.S.C. § 1 and Section 4 of the Clayton Act, 15 U.S.C. § 15, and also asserts a common law claim for tortious interference with prospective contractual relationships.

2. Plaintiff seeks to recover compensatory, treble and punitive damages, reimbursement of its attorneys' fees and costs, and to obtain injunctive relief to prohibit MarketPlace from continuing its unlawful anticompetitive practices.

3. MarketPlace is a real estate company responsible for the leasing, development, and management of food and retail space at Philadelphia International Airport ("PHL"). MarketPlace serves as landlord on behalf of PHL's owner, the Division of Aviation of the City of Philadelphia ("Airport"). Together, with the encouragement of beverage consultant Enliven, LLC ("Enliven"), they have engaged in a scheme to gain control over the sale of beverages at PHL by imposing "pouring rights" provisions in leases and/or subleases via a prohibited antitrust tying arrangement.

These "pouring rights" provisions require that, as a condition of a lease or sublease for retail or concession space, lessees at PHL, like Host, must agree that beverages sold on their leased premises be subject to the exclusive control of MarketPlace, in its capacity as landlord. In particular, the leases negotiated and entered into by MarketPlace, acting in conjunction with the Airport, require that lessees acknowledge that they will be subject to "pouring rights" agreements MarketPlace enters into with any third-party beverage supplier that grants the third party the right to provide beverages on an exclusive basis.

4. The ultimate object of this scheme is to gain and benefit from exclusive control over the distribution and sale of beverages and other products. Accomplishing this illegal objective will enable MarketPlace and the Airport to maximize their own profits – through the receipt of payoffs from a third-party soda company – at the expense of PHL consumers, competing beverage suppliers, and lessees of concession and retail space at PHL. The pernicious effect of this illegal tying arrangement is to eliminate and prevent competition, restrict consumer choice, raise beverage prices, and exclude competing beverage suppliers from PHL. Foremost among those excluded are local, innovative small businesses, including minority- and woman-owned businesses, in favor of a big soda company.

5. MarketPlace knows that these anticompetitive effects will be the result of its actions. As represented to MarketPlace by Enliven, payoffs from a big soda company are to "shut competitors out" and gain exclusive access to an airport's "captive audience." Likewise, Enliven represents that concessionaires, like Plaintiff, "of course, will resist [pouring rights] at first. But, ultimately, they will play ball." Necessarily, concessionaires are forced to "play ball" because MarketPlace and the Airport have used their absolute power in the market for PHL retail and

concession space to shut out any retailers or concessionaires that refuse to knuckle under to anticompetitive pouring rights.

6. On information and belief, MarketPlace has not made public the PHL pouring-rights agreement that has been entered with a big soda company. Moreover, the mandatory pouring-rights lease terms standing alone have already caused damage to Host and the PHL air-traveling public at large. The secrecy that has enveloped the imposition of a pouring-rights regime at PHL indicates that MarketPlace is aware of its anticompetitive nature and the near-certain negative public reaction to its implementation. Indeed, the adverse impact of pouring rights in the context of airport venues on competition, price, and consumer choice has been widely documented and has resulted in the withdrawal or reformation of those terms at other major U.S. airports.

7. By tying the right to occupy airport retail and concession space at PHL to the obligation to exclusively purchase and sell beverages mandated by MarketPlace and the Airport, MarketPlace has violated the prohibition against restraints of trade found in the Sherman Antitrust Act, 15 U.S.C. § 1. This policy of mandating pouring rights has also damaged Plaintiff by interfering with Host's prospective contractual arrangements. But for the imposition of an illegal pouring-rights regime, Host would have executed long-term leases to operate a Starbucks and a Buena Onda restaurant at PHL.

**JURISDICTION AND VENUE**

8. This Court has subject matter jurisdiction over this dispute under 28 U.S.C. § 1331 and § 1337, since Plaintiff asserts claims under Section 1 of the Sherman Act and Section 4 of the Clayton Act. This Court has supplemental jurisdiction over the state law claim pursuant to 28 U.S.C. § 1367, because the federal and state law claims arise from the same events and transactions, involve substantially identical issues of fact and law and are so related to each other

that they form part of the same case or controversy under Article III of the United States Constitution.

9. Venue is appropriate in this judicial district under 28 U.S.C. § 1391, because MarketPlace has transacted business within the State of Pennsylvania and many of the acts and events giving rise to this action occurred within this district.

## PARTIES

10. Host International, Inc. is a corporation organized and existing under the laws of the State of Delaware and maintains its principal place of business at 6905 Rockledge Drive, Bethesda, Maryland 20817. Host operates food, beverage, and merchandise concessions at more than 120 airports worldwide, including PHL. It is a wholly-owned subsidiary of HMSHost Corporation.

11. Defendant MarketPlace PHL, LLC is a limited liability corporation organized and existing under the laws of Delaware and maintains is principal place of business at Philadelphia International Airport, Terminal E, Upper Level, 8500 Essington Avenue, Philadelphia, Pennsylvania 19153. It is a subsidiary of MarketPlace Development, Inc., a Delaware corporation with its principal place in Boston, Massachusetts, which manages and operates retail leasing space at airports located in the Northeastern corridor. MarketPlace Development, in turn, is a Delaware corporation owned by New England Development, also based in Boston, which is a real estate development and management company with more than 50 million square feet of retail, commercial, and residential space as part of its portfolio.

## FACTS COMMON TO ALL COUNTS

**A. Air Travelers Benefit from Expanding Retail Marketing at Airport Venues.**

12. In recent years, air travelers, as well as all other airport consumers, have greatly benefitted from expanding food, beverage, and merchandise marketing at airport venues across the

country. Surveys show that large percentages of travelers arrive at the airport at least two hours ahead of their scheduled flight time. On average, air passengers also have greater financial resources than average U.S. households. According to a survey conducted at PHL, 41% of its air travelers earn annual incomes in excess of $100,000, more than double the percentage of households nationwide whose income exceeds that threshold. Professionals and executives, who frequently travel on employer-paid expense accounts, constitute 46% of passengers at PHL.

13. Not surprisingly, travelers use that extra time at the airport to purchase meals, snacks, and drinks. When connecting through an airport like PHL, those travelers might not have another opportunity to obtain a meal and accompanying beverage for many hours. According to a survey conducted at PHL, 78% of air-traveling passengers purchased food and beverage products while on the airport premises.

14. The air traveling public has reaped significant benefits in this expanding and profitable market. Utilizing up-to-date customer and industry research, restauranteurs and retailers at the airport have optimized the range of available products and enhanced consumer satisfaction. Recent innovations include, but are by no means limited to, health/wellness beverages, premium water, locally-sourced and manufactured beverages, and an overall increase in supplier variety. Indeed, flavored waters, plant-based milks, cold-brew coffee, aguas frescas, cold-pressed juices, and meal replacements comprise only some of the modern consumer beverage preferences. These and other trends should thrive, absent intervention by outside forces.

15. Like other airport venues, PHL has benefitted from expanding consumer choice for the air-traveling public. With over 200,000 square feet of stores and eateries, PHL features approximately 170 stores, restaurants, and services, plus more than two dozen retail merchandisers. According to a study, food and beverage sales at PHL in 2016 were $117 million.

Serving more than 30 million passengers annually, PHL has more than 500 daily departures to 130-plus destinations, including 36 international destinations. It is the only major airport serving the fifth largest metropolitan area in the U.S. and the second largest city on the East Coast.

16. Host, as part of the HMSHost family of companies, has been at the forefront of the airport food and beverage industry for many years, both at PHL and around the world, and is an expert in restaurant and concession operations. Altogether, its development team has created customized food and beverage programs at more than 120 airports worldwide, including U.S. destinations from Philadelphia to Honolulu, and abroad from Abu Dhabi to New Zealand. The food concessions and restaurants it helps create and operate receive frequent industry recognition.

B. **"Pouring Rights" Provisions and the Threat of Harm to the Airport Beverage Market.**

17. The highly competitive nature of the PHL concession and retail space, which includes a wide range of products and competitive pricing that benefits consumers, is gravely threatened by "pouring rights" agreements. As incorporated into leases and subleases for airport retail and concession space by MarketPlace and the Airport, these provisions require that, as a condition for the lease of retail or concession space, a lessee must agree that beverages and other products sold on the leased premises be subject to the exclusive control of the lessor. The lessor or its designee then exploits its power by contracting exclusively with a major soda company, and in exchange for payoffs, restricts beverage selection to its own products, which can only be purchased through the beverage company's designated suppliers and are sold at non-competitive, higher prices.

18. Pouring-rights agreements cause significant harm, both financial and otherwise, to the business model carefully cultivated and developed by market participants, like Plaintiff, who compete in the airport food and beverage space. Typically, pouring-rights agreements extend for

multi-year periods, sometimes as long as ten years or more, and are presented as a take-it-or-leave-it proposition. When then tied to access to the leasing or subleasing of airport concession space, pouring-rights provisions place lessees in the impossible position of either being forced out of business in the airport altogether or agreeing to an arrangement that will significantly harm them, their business partners and vendors, and their customers.

19. Either way, competition and consumer choice are harmed. Those market participants who refuse to accede to pouring-rights provisions and their restricted-choice, higher-price regime are denied a leasing arrangement on the airport premises, and are thereby eliminated from the market. Consumers are harmed not only by the loss of choice in the beverage market, but also by the unavailability of other products sold by those venders that may not be available in the airport. Market participants who elect not to be put out of business and accept the provision suffer significantly diminished profits, as consumers reduce their beverage purchases in the face of less choice and higher prices. As well, competing beverage suppliers who would have sold their beverages at the airport but for pouring rights are likewise eliminated from the market, in favor of the big soda company.

20. Even worse, because exclusive beverage providers face limited or no competition, key incentives for lower prices and higher-quality products are removed. Because of the multi-year duration of pouring-rights provisions, the harm to competition and consumer choice is long-term in nature. "Pouring rights" thus sacrifices pro-consumer benefits—like lower prices and choice—for the sake of anti-consumer exclusive dealing, landlord payoffs, and higher prices.

21. The imposition of pouring rights on airport concession and retail lessees and sub-lessees has occurred in the past only on a very limited basis. In some instances, pouring-rights provisions were withdrawn or significantly reformed in response to public demand. For example,

at Hopkins Airport in Cleveland, the pouring rights regime was allowed to lapse and was not renewed after a five-year exclusive pouring-rights deal expired in 2013.

22. While an exact quantification of the harmful impact of pouring-rights agreements on beverage prices and revenues at PHL must await full discovery, the overall impact is unmistakable. Host estimates that if it moved to the pouring-rights pricing imposed on PHL lessees compared to current Host costs by various suppliers, costs at its existing units would increase by over 30%. In the case of some specific beverages, the price increases would be even more dramatic. For example, the price increase for regular non-premium water is more than 40% for a smaller serving size under pouring rights. In short, under pouring-rights agreements, costs increase to lessees which means raising prices. Higher prices and less choice translate into less consumer demand and lower profits, thus damaging market participants like Plaintiff, other lessees, consumers, and competing beverage suppliers.

23. Consumers not only pay more for beverages under pouring-rights agreements, they face a diminished and inferior range of beverage selections, and thus buy fewer beverages. This reduction in product demand also translates into lower profits for airport venue retail and concession vendors, like Plaintiff. After all, the nature of pouring-rights agreements is to exclude competing beverages to the benefit of those favored by the lessor. The reason for the favoritism is paying off the lessor, rather than product diversity, quality or innovation, which are key components to increasing consumer satisfaction and demand.

24. Consumer dissatisfaction caused by pouring-rights agreements is demonstrable. For example, at one airport, a pouring-rights provision resulted in the exclusion of three of four premium brands of bottled water. In response, consumers, deprived of their preferred product, bought less water and increased their relative consumption of base non-premium water, resulting

in an overall decrease in the consumption of premium bottled water by approximately 20%. That is the very definition of market harm to consumers, lessees, and bottled water competitors. In another market study, 17% of respondents indicated it is essential that the water they purchase be natural spring water, indicating they would not buy it otherwise. In sum, different water products are not perfect substitutes from a consumer perspective.

25. Other examples abound. One key metric to airport concessionaires is the ratio of the sales of food to beverages. Based on an analysis which took an average from the four largest U.S. airports (none of which is subject to pouring-rights agreements), the ratio is around 16%; in other words, beverage sales are roughly one-sixth of food sales. With pouring rights imposed, as they are at an airport used for comparison purposes, the ratio is only 11.5% for like facilities, meaning that beverage sales were closer to one-ninth of food sales under a pouring-rights regime. This lower beverage ratio translates into fountain and bottled beverage sales being approximately 29% lower. In short, restricted variety decreases beverage revenues, causing harm to consumers, lessees, and beverage competitors.

26. Other analyses reach the same result. In an experiment that tested moving to a single beverage supplier at an airport grab-and-go market concept, the net reduction in beverage sales compared to sandwich/salad sales was greater than 20%. In another test, moving to a particular beverage supplier's portfolio for like items resulted in a sales decline of more than 40% when compared to food sales. Pouring rights gives authorities broad latitude to implement any beverage provider regardless of quality or consumer preference, and inevitably results in market harm.

27. The higher prices and restricted choices inherent in pouring-rights agreements clearly harm airport market participants like Host. When faced with higher prices and fewer

choices, consumers naturally respond by buying fewer beverages. The loss of sales revenues and resulting profits has an immediate, negative impact on vendors like Host.

28. Pouring rights also threaten the distinctive business model developed and cultivated by Host at PHL. That model is focused on consumer choice and innovation. To that end, Host uses multiple beverage suppliers, which ensures a range of selections and timely responsiveness to the latest consumer trends. Host's use of different suppliers also allows it to differentiate itself from other lessees in the airport through its unique offerings, which again benefits consumer choice.

29. Additionally, Plaintiff brings to the airport beverage market unique products that serve diverse portions of the population, including those from minority-owned businesses. For example, the Airport Concession Disadvantaged Business Enterprise ("Disadvantaged Businesses") program, 49 C.F.R. Part 23, was created to insure a level playing field in which Disadvantaged Businesses are afforded an opportunity to fairly compete for, among other things, contracts at airport locations. Pursuant to that program, Plaintiff has marketed products from Disadvantaged Business suppliers, underscoring the importance of allowing small suppliers to compete with big soda companies. Pouring-rights agreements ignore or marginalize Disadvantaged Businesses, sacrificing them and the pro-consumer benefits they bring in favor of the big beverage companies, limited choice and higher prices.

30. Ultimately, the beverage market is a dynamic, growing category with significant innovation. An exclusive market with one beverage supplier runs counter to a competitive concessions program capable of generating maximum revenue and rents. A pouring-rights regime reduces the variety that customers are seeking, eliminates the opportunity for local, innovative and diverse beverage suppliers, lowers revenues, and creates barriers to entry to new brands and products sought by consumers.

### C. The Scheme to Enforce Pouring Rights on Host.

31. Host is a market participant in vending and concession sales at PHL.

32. In late 2017 and continuing through early 2018, Host entered into negotiations with MarketPlace concerning a leasing arrangement for concession lease space at PHL. Indeed, Host was notified that it was successfully awarded two concession spaces pursuant to MarketPlace's request-for-proposal process. But thereafter Host rebuffed the demand that it accept anti-consumer pouring rights in the lease and, solely due to Host's refusal to knuckle under, MarketPlace refused to enter a lease with Host.

33. Throughout the negotiations, MarketPlace was acting on behalf of itself as landlord under the terms of the leasing arrangement with Host, and on behalf of the Airport as prime landlord for concession and retail space at PHL. In that capacity, MarketPlace, acting on behalf of the Airport, was the sole provider of concession lease space at PHL and exercised monopoly power.

34. During the negotiations with Host, MarketPlace and the Airport insisted that as a condition of the leases that they must agree to a "pouring rights" provision. To that end, MarketPlace informed Host that it must agree to the following provision as a condition of its lease:

> Tenant [Host] acknowledges that Landlord [MarketPlace] and/or Prime Landlord [Airport] may, from time to time, enter into agreements with third-parties granting to such third-parties exclusive or semi-exclusive rights to be sole providers of certain foods, beverages or other types of products or brands of products advertised, sold and served at [PHL] or any part thereof. Such agreements may include but shall not be limited to so-called "pouring rights" agreements granting a beverage manufacturer, bottler, distributor or other company (e.g., Pepsi or Coca-Cola) the exclusive control over beverage products advertised, sold and served at [PHL].

35. The lease language imposed by MarketPlace and the Airport restricts not just beverages, but potentially any "other type of product" marketed at PHL. Imposed against a

concessionaire here, MarketPlace and the Airport may next tell rental car companies that they can only rent a specific manufacturer's brand of automobile, as long as the car manufacturer pays off MarketPlace and the Airport. If the rental car companies balk, MarketPlace and the Airport will refuse to let them rent cars on PHL property, regardless of the harm to the public, rental car companies, and competing car manufacturers.

36. Host repeatedly sought to dissuade MarketPlace and the Airport from imposing the pouring-rights provision. In response, MarketPlace and the Airport stated that the pouring-rights provision could not be removed from the lease and that the lease as written with the pouring-rights provision was a take-it-or-leave-it proposition. Indeed, the Airport's Chief Revenue Officer told Host flatly that any lease at PHL "will have to include pouring rights language."

37. Host refused to enter into a lease containing this illegal, anticompetitive provision, and as a result MarketPlace took several highly valuable business opportunities away. In particular, but for the pouring-rights provision, Host would have entered into two long-term, seven-year subleases with MarketPlace to operate a Starbucks and a Buena Onda restaurant at PHL. Host would have derived significant profits and other benefits from operating these businesses.

    **D.**    **Relevant Product Market and Geographic Market.**

38. There is a distinct product market at PHL for the provision of non-alcoholic beverages, which are sold to the air-traveling public, as well as to the employees and contractors working on the airport premises. Along with others, Host competes in the market to sell such beverages at PHL. A key determinant to success in that product market is access to a full array of beverages, which are selected for sale in response to consumer demand.

39. The beverage market at PHL is independent from the market for the lease of concession and retail space at PHL, which is controlled by MarketPlace and the Airport. Indeed,

before MarketPlace and the Airport tied the two markets together through pouring rights, the separate markets had functioned independently for decades, as they continue to do in most airports.

40. The relevant geographic market for purposes of the beverage market and the market for lease of concession and retail space is the premises of PHL, including the area secured by the Transportation Security Association ("TSA").

41. The only beverages which may be consumed within the premises of PHL secured by the TSA are those purchased within those same premises. Bringing beverages beyond the security checkpoint at PHL is prohibited. Further, individuals who are within the TSA-secured premises of PHL may exit and re-enter only at great inconvenience, including a second security check. Even then, the only beverages available outside the TSA-secured premises within PHL are likewise subject to the pouring-rights regime.

42. There are no reasonable substitutes for the beverages marketed on the premises of PHL. The nearest locations to obtain substitute beverages are convenience stores and gas service stations and similar businesses located in the vicinity of PHL. These locations are situated far from the PHL premises, requiring a walk of approximately 30 minutes or more, or a drive, either by car or public transportation, through congested traffic and stop lights, often requiring more than ten minutes.

### COUNT I

**Violation of Section 1 of the Sherman Antitrust Act,
15 U.S.C. § 1 – Anticompetitive Tying Arrangement**

43. Plaintiff incorporates by reference, as if fully set forth herein, all foregoing paragraphs of this Complaint.

44. The market for airport vending and concession space is separate and distinct from the market for non-alcoholic beverage products at PHL. There is a separate demand for these products, which are marketed and sold separately.

45. There is a distinct product market for the provision of non-alcoholic beverages at PHL, which are sold to the air-traveling public, employees and contractors working on the airport premises, and others. Host competes in the market to sell such beverages at PHL.

46. The relevant geographic market is the premises of PHL, including the area secured by the TSA. The only beverages which may be feasibly purchased and consumed at PHL are those purchased on the airport premises. Bringing beverages beyond the security checkpoint at PHL is prohibited. Thus, there are no reasonable substitutes for the beverages marketed within the premises of PHL.

47. In negotiations with Host for the leasing/subleasing of airport retail and concession space at PHL, MarketPlace and the Airport tied the leasing or subleasing of such space to a "pouring rights" requirement in the proposed lease/sublease, mandating that beverages and other products sold by Host at PHL be subject to the exclusive control of defendants. On information and belief, MarketPlace has already entered into an exclusive agreement with a third-party soda company, the terms of which will result in harm to competition, higher prices and less consumer choice. The foregoing conduct is *per se* unlawful under Section 1 of the Sherman Act.

48. Because MarketPlace and the Airport are the exclusive source for the leasing/subleasing of airport retail and concession space at PHL, they have market power for the leasing/subleasing of such space. MarketPlace and the Airport likewise have sufficient market power to restrain trade in the separate market for the provision of beverages, and have done so

with respect to Host by refusing to enter into a lease/sublease in the absence of a pouring-rights provision.

49. Through the unlawful acts and practices described above, MarketPlace and the Airport have attempted to cause and have in fact caused harm to competition, including competitive harm to Host, and potentially to other lessors/sublessors at PHL, as well as to competing beverage suppliers shut out of the market under pouring rights and consumers of beverages and other products at PHL.

50. The restraint of trade and damages caused by MarketPlace and the Airport's unlawful acts as described above are adversely affecting a not-insubstantial amount of interstate commerce.

51. MarketPlace and the Airport's tying of the subleasing/leasing of airport retail and concession space to mandatory pouring rights alternatively violates Section 1 of the Sherman Act under a rule-of-reason analysis.

52. There are no or minimal efficiencies or other pro-competitive benefits to tying the subleasing/leasing of airport retail and concession space to mandatory pouring-rights provisions. Conversely, this conduct has significant anti-competitive effects and has caused competitive harm to Host. Any purported pro-competitive benefits would be outweighed by the substantial harm to competition MarketPlace and the Airport have caused.

53. The foregoing acts and conduct of MarketPlace and the Airport have prevented or suppressed competition, and will continue to prevent or suppress competition, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and unless enjoined, are likely to cause irreparable future injury to the public, plaintiffs and other lessors/sublessors at PHL, and competing beverage suppliers.

WHEREFORE, plaintiff Host International, Inc. demands judgment in its favor and against defendant MarketPlace PHL, LLC for the following relief:

A. A declaration that the practice at PHL of tying the leasing/subleasing of airport retail and concession space to the beverage market through pouring-rights provisions is illegal and unenforceable;

B. A permanent injunction (1) prohibiting MarketPlace from continuing to engage in the above-referenced unlawful tying arrangement; and (2) prohibiting MarketPlace from enforcing the pouring-rights provision found in any sublease agreements at PHL.

C. An award of damages in an amount consistent with the proof and evidence submitted at trial for the losses sustained by Plaintiff due to MarketPlace and the Airport's wrongful conduct, trebled as provided by law;

D. An award of attorneys' fees and costs in pursuing this action; and

E. An award of such other legal and equitable relief as is just and appropriate.

## COUNT II

**Violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1**
**Conspiracy and Agreement in Restraint of Trade**

54. Plaintiff incorporates by reference, as if fully set forth herein, all foregoing paragraphs of this Complaint.

55. By imposing pouring rights as a condition for the leasing of retail and concession space at PHL, MarketPlace, the Airport, and an exclusive third-party beverage company, encouraged by consultant Enliven, LLC, entered into and enforced a *per se* unlawful agreement, contract, combination, and/or conspiracy to restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. MarketPlace, the Airport, and an exclusive third-

party beverage company, encouraged by consultant Enliven, LLC, have made and continue to make, a conscious commitment to this unlawful scheme.

56. This conduct harms Host in its capacity as a beverage marketer at PHL by mandating that it market and sell an inferior array of products at higher costs. Further, this conduct harms competition by restricting choice and raising prices to consumers, to the detriment of retailers and concessionaires like Plaintiff, the air-traveling public, and competing beverage suppliers.

57. The agreement, contract, combination, and/or conspiracy does not offer any countervailing procompetitive benefits and thus fails the rule-of-reason analysis. In the marketing of non-alcoholic beverages at PHL, there is no benefit to the air-traveling public and other consumers from the higher prices and restricted choices that are the direct result of MarketPlace and the Airport's scheme. Any purported pro-competitive benefits would be outweighed by the substantial harm to competition MarketPlace and the Airport have caused.

WHEREFORE, plaintiff Host International, Inc. demands judgment in its favor and against defendant MarketPlace PHL, LLC for the following relief:

    A. A declaration that the practice at PHL of tying the leasing/subleasing of airport retail and concession space to the beverage market through pouring-rights provisions is illegal and unenforceable;

    B. A permanent injunction (1) prohibiting MarketPlace from continuing to engage in the above-referenced unlawful conspiracy; and (2) prohibiting MarketPlace from enforcing the pouring-rights provision found in any sublease agreements at PHL.

    C.    An award of damages in an amount consistent with the proof and evidence submitted at trial for the losses sustained by Plaintiff due to MarketPlace and the Airport's wrongful conduct, trebled as provided by law;

    D.    An award of attorneys' fees and costs in pursuing this action; and

    E.    An award of such other legal and equitable relief as is just and appropriate.

## COUNT III

### Tortious Interference with Prospective Contractual Relationships

58.    Plaintiff incorporates by reference, as if fully set forth herein, all foregoing paragraphs of this Complaint.

59.    As a direct, intended and proximate result of the aforesaid anti-competitive conduct, Host was precluded from entering into a sublease at PHL, as well as related contracts, for the operation of a Starbucks and a Buena Onda restaurant. Host would have entered into the proposed, seven-year subleases with MarketPlace but for the antitrust violations described herein.

60.    MarketPlace acted without justification.

61.    The foregoing acts and conduct of MarketPlace and the Airport have caused Host to suffer the loss of profits and other benefits it would have derived from these prospective contracts. Host has also suffered a loss of goodwill and other irreparable harm, which will continue unless enjoined by this Court.

62.    MarketPlace has acted willfully, maliciously and/or with specific intent to harm Host or with callous disregard as to the potential harm to Host.

WHEREFORE, plaintiff Host International, Inc. demands judgment in its favor and against defendant MarketPlace PHL, LLC for the following relief:

    A.    A permanent injunction prohibiting MarketPlace from continuing to engage in the above-referenced unlawful practices;

- 19 -

      B.    An award of damages in an amount consistent with the proof and evidence submitted at trial for the losses Host has incurred due to MarketPlace's wrongful conduct.

      C.    An award of punitive damages; and

      D.    An award of such other legal and equitable relief as is appropriate.

Dated: May 10, 2019.

Respectfully submitted,

_____

| | |
|---|---|
| R. Paul Yetter<br>pyetter@yettercoleman.com<br>Bryce L. Callahan<br>bcallahan@yettercoleman.com<br>YETTER COLEMAN LLP<br>811 Main Street, Suite 4100<br>Houston, Texas 77002<br>(713) 632-8000<br>(713) 632-8002 (Fax) | Howard Langer<br>hlanger@langergrogan.com<br>Edward Diver<br>ndiver@langergrogan.com<br>LANGER GROGAN & DIVER, PC<br>1717 Arch Street, Suite 4020<br>Philadelphia, PA 19103<br>(215) 320-5660<br>(215) 320-5703 (Fax)<br><br>ATTORNEYS FOR PLAINTIFF<br>HOST INTERNATIONAL, INC. |