IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

_____

HOST INTERNATIONAL, INC., :
          Plaintiff, :
   :
     v. : Civil No. 2:19-cv-02036-JMG
   :
MARKETPLACE, PHL, LLC, :
          Defendant. :
_____

## MEMORANDUM OPINION

     Plaintiff Host International ("Host") brings this lawsuit after ending negotiations to lease two concession spaces at Philadelphia International Airport ("PHL") from Defendant MarketPlace, PHL ("MarketPlace"). Host presents antitrust and tortious interference claims arising from pouring rights provisions in the proposed leases that give one beverage company exclusive distribution rights at the airport's concession spaces. Specifically, Host alleges Sherman Antitrust Act claims of an anticompetitive tying arrangement (Count I), and a conspiracy and agreement in restraint of trade (Count II), as well as a common law claim for tortious interference with prospective contractual relationships (Count III), against MarketPlace. See Compl., ECF No. 1. MarketPlace filed a Motion to Dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6). See Def.'s Br., ECF No. 14.

     The Court finds Plaintiff failed to state a claim upon which relief can be granted under the Sherman Antitrust Act for Counts I and II. After dismissing those claims, the Court declines to exercise supplemental jurisdiction over Plaintiff's claim for tortious interference and dismisses the entire Complaint with prejudice.

I. **FACTUAL BACKGROUND**[1]

MarketPlace is a real estate company and de facto landlord of food and retail space at PHL on behalf of the airport's owner, the City of Philadelphia. Compl. ¶ 3. As landlord, MarketPlace leases space at the airport to concessionaires and restaurants. Compl. ¶ 3. Host is a concessionaire, operating multiple vending and restaurant spaces at 120 airports around the world, including PHL. Compl. ¶ 10.

In late 2017 and early 2018, the parties began negotiating two leases for concession spaces at the airport that Host alleges it would have subleased to Starbucks and Buena Onda restaurant.[2] Compl. ¶ 37. The proposed leases between Host and MarketPlace contained pouring rights provisions requiring non-alcoholic beverages sold in those spaces be subject to MarketPlace's control. Compl. ¶ 3. MarketPlace requires its lessees to follow these provisions, which give a contracted third-party beverage company exclusive rights to distribute at the airport's concession spaces. Compl. ¶ 3. Pouring rights arrangements are a fixture in the concession industry, as both parties cite examples of venues and marketplaces that impose pouring rights conditions on their vendors. Compl. ¶ 21; Oral Arg. Tr. 8:22-9:3, ECF No. 27. As a result of these provisions, Host rejected the leases, ended negotiations, and alleges it lost "significant profits and other benefits." Compl. ¶¶ 32, 37.

II. **PROCEDURAL BACKGROUND**

On May 10, 2019, Host filed suit against MarketPlace. See Compl. On July 9, 2019, MarketPlace filed the instant Motion to Dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6). See Def.'s Br. On August 12, 2019, Host responded in opposition to the motion. See Pl.'s Br., ECF

---

[1] At this stage of litigation, the Court operates "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).

[2] Host alleges, but for the pouring rights provisions, it would have entered seven-year subleases to operate a Starbucks and a Buena Onda at PHL. Compl. at ¶ 37. Host does not plead any factual allegations to buttress its claim that it had the subleases "in hand." Pl.'s Br. at 29.

No. 16.  On February 28, 2020, the case was re-assigned to this Court.  See ECF No. 18.  On March 10, 2020, MarketPlace filed a reply brief in further support of its motion.  See Def.'s Reply Br., ECF No. 20.  On May 27, 2020, the Court heard oral arguments on the motion.  See Oral Arg. Tr.  On June 10, 2020, both parties submitted their post-argument supplemental briefs.  See Pl.'s Supp. Br., ECF No. 30; Def.'s Supp. Br., ECF No. 31.

### III. DISCUSSION

To survive a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), the factual allegations in the complaint "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true even when doubtful in fact."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  While a complaint does not need detailed factual allegations, it needs to provide more than labels, conclusions, and "a formulaic recitation of the elements of a cause of action."  Id.  The Court's inquiry into a motion to dismiss can be broken into these three steps: 1) identifying the claim's elements; 2) striking conclusory allegations from the complaint; and 3) evaluating whether the well-pleaded allegations of the claim's elements are sufficiently alleged.  Malleus v. George, 641 F.3d 560, 564 (3d Cir. 2011).

Host brings two claims arising under the Sherman Antitrust Act—an anticompetitive tying arrangement, and conspiracy and agreement in restraint of trade.  See Compl. ¶¶ 43-57.  Under the Sherman Act, an anticompetitive tying arrangement is "an agreement by a party to sell one product or service but only on the condition that the buyer also purchases a different or tied product or service."  Avaya Inc., RP v. Telecom Labs, Inc., 838 F.3d 354, 397 (3d Cir. 2016).  However, not all such ties are illegal.  Id. at 398.  Antitrust concerns over tying arrangements only arise when the "seller can exploit its power in market for tying product to force buyers to purchase tied product when

they otherwise would not." Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 442 (3d Cir. 1997).[3]

Under the Sherman Act, a restraint of trade claim consists of a concerted action imposing an unreasonable restraint on trade that "inhibits competition in the relevant market." Lifewatch Services, Inc. v. Highmark Inc., 902 F.3d 323, 332-35 (3d Cir. 2018).  A restraint of trade claim requires an allegation of a contract, combination, or conspiracy that restrains trade unreasonably.  Toledo Mack Sales & Service, Inc. v. Mack Trucks, Inc., 530 F.3d 204, 218 (3d Cir. 2008).

To plead a Sherman Act claim, the complainant must have antitrust standing *and* plead a "relevant geographic market."  City of Pittsburgh v. West Penn Power Co., 147 F.3d 256, 264 (3d Cir. 1998); Queen City Pizza, Inc., 124 F.3d at 436.  Here, Host sufficiently pleads standing from its injury, however, it fails to establish the necessary relevant geographic market.

In the Complaint, Host alleges the relevant geographic market at issue is the premises of PHL. Compl. ¶ 40.  As discussed below, Host's basis for standing and its proposed relevant geographic market are incompatible.  The Court recognizes Host's standing to bring an antitrust claim, but we find its relevant geographic market to exceed the bounds of PHL.

**A. Standing**

Antitrust standing demands more than the Article III standing requirements of injury in fact, causation, and redressability.  In re Processed Egg Prods. Antitrust Litig., 881 F.3d 262, 268 (3d Cir. 2018).  An antitrust plaintiff needs to establish its injury, but an injured party is not always a "proper plaintiff."  Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 110 n.5 (1986).  To show antitrust injury, the complainant must establish that it suffered an injury "of the type the antitrust laws were

---

[3]      Courts often illustrate an allowable tying arrangement as follows: "[I]f one of a dozen food stores in a community were to refuse to sell flour unless the buyer also took sugar it would hardly tend to restrain competition if its competitors were ready and able to sell flour by itself." Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494, 510 n.6 (3d Cir. 1998).

intended to prevent," and the injury flows from defendants' unlawful conduct. Atlantic Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 349 (1990). Beyond injury, the Third Circuit considers the following several factors in determining antitrust standing:

> (1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause that harm, with neither factor alone conferring standing; (2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.

In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144, 1165-66 (3d Cir. 1993).

Host argues it has antitrust standing because it suffered an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful." See Pl.'s Br., 25 (relying on Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977)). Host alleges MarketPlace's pouring rights practice violates the Sherman Act by suppressing competition, and as a result, Host suffered the injury of exclusion from PHL's concession market. Pl.'s Br., 25; Pl.'s Supp. Br., 10.

At the motion to dismiss stage, the Court acknowledges Plaintiff's antitrust injury. Contrary to MarketPlace's argument, Host pleads a plausible injury from refusing to agree to a contract with pouring rights provisions, even though Host terminated contract negotiations. At issue is whether such intervening conduct can affect the causation of antitrust injury. The District Court has held that intervening conduct "does not sever the chain of causation where that conduct was a foreseeable consequence of the original antitrust violation." In re Flonase Litigation, 798 F. Supp. 2d 619, 629 (E.D. Pa. 2011). Whether the intervening conduct is a foreseeable consequence of the original action is a question of fact, and therefore, not a basis for dismissal at this stage.[4] Thabault v. Chait, 541 F.3d

---

[4] At the motion to dismiss stage, the Court can only decide whether intervening conduct was proximately caused by or was the foreseeable consequence of a defendant's actions if "the outcome

512 (3d Cir. 2008); see Callahan v. A.E.V., Inc., 182 F.3d 237, 257 (3d Cir. 1999) (holding that causation of an antitrust injury is an issue for the jury).

At this stage of pleadings, the intervening conduct is Host's refusal to continue negotiations for the two concession spaces. Whether that conduct is a foreseeable consequence of the pouring rights agreement is not for the Court to decide as a matter of law. At this stage, Host plausibly pleads MarketPlace's pouring rights agreement inflicted an antitrust injury by excluding Host from PHL. Host has standing to bring a claim to remedy this specific injury, but only this specific injury.

To be clear, the alleged antitrust injury in this case is Host's exclusion from PHL, and an ensuing loss of profits. In oral argument, Host confirmed that its claimed injury is the deprivation of access to airport concession space. Oral Arg. Tr. 51:21-51:24. Having defined this injury, we also note this injury is not a prohibition on the sale of beverages. Furthermore, Host is claiming an injury on its behalf alone. Despite references of potential harm to others, Host is not arguing by proxy on behalf of PHL employees who patronize the airport's concessions, the travelling public, Starbucks, Buena Onda, or other beverage companies. In oral argument, Host confirmed that it does not seek to repair "derivative harm that a consumer has." Oral Arg. Tr. 69:7-69:8. Host seeks remedy for its injury alone, and that injury is its exclusion from PHL.

**B. Relevant Geographic Market**

Having found that Host established standing at the pleadings stage, we analyze the relevant geographic market for airport concession space. Said otherwise, we examine the market in which Host shops for that which it contends MarketPlace improperly denied them. In doing so, we conclude Host cannot establish that airport concession space is limited to a relevant geographic market of a single airport in Philadelphia.

---

is clear or when highly extraordinary events or conduct take place." Thabault v. Chait, 541 F.3d 512, 524 (3d Cir. 2008). In this case, the Court does not find these exceptions apply to the intervening conduct of the breakdown in negotiations.

MarketPlace argues a single venue cannot be a relevant geographic market, especially when commercial realities dictate that Host can take its business elsewhere. See Def.'s Br., 10 (citing Atl. Exposition Servs. v. SMG, 262 F.App'x 449, 452 (3d Cir. 2008) (holding "City convention center was not its own geographic market [for producing trade shows], given that trade show producers had other options for locations at which to conduct trade shows.")). At odds here is whether, in the market of airport concession space leasing, one airport, PHL, constitutes a relevant geographic market. The Court concurs with MarketPlace in holding it does not.

Antitrust plaintiffs must establish the relevant geographic market. Queen City Pizza, Inc, 124 F.3d at 436. The relevant geographic market "is that area in which a potential buyer may rationally look for the goods or services he seeks." Gordon v. Lewistown Hosp., 432 F.3d 184, 212 (3d Cir. 2005). The geographic market is not the region in which the seller attempts to sell the product, but where consumers would look to buy such a product. Premier Comp Solutions LLC v. UPMC, 377 F. Supp. 3d 506 (W.D. Pa. 2019). The proposed market's geographic scope must "correspond to the commercial realities of the industry." Brown Shoe Co. v. United States, 370 U.S. 294, 336-37 (1962). In most cases, market definition requires "a factual inquiry into the commercial realities faced by consumers." Hanover 3201, LLC v. Vill. Supermarkets, Inc., 806 F.3d 162, 183 (3d Cir. 2015). Courts will grant a motion to dismiss for failure to define a relevant market if "the alleged market makes no economic sense under any set of facts." GN Netcom, Inc. v. Plantronics, Inc., 967 F. Supp. 2d 1082, 1087 (D. Del. 2013). There is no per se prohibition against dismissing antitrust claims for failure to plead a relevant market. Queen City Pizza, 124 F.3d at 436.

As outlined above, Host has standing to bring an antitrust claim for its injury. However, its proffered relevant geographic market does not comport with the service or good at issue, which is airport concession retail space. The relevant geographic market is where consumers "may rationally look to for the goods or services he seeks." Gordon, 432 F.3d at 212. In this case, Host is the

consumer bringing the claim, and the product at issue is airport concession retail space.  Host can, and does, look to buy this product all over the world.  By its own admissions, Host operates retail space in 120 airports "from Philadelphia to Honolulu, and abroad from Abu Dhabi to New Zealand." Compl. at ¶ 16.  By choosing not to operate at PHL, Host is not shut out of the market for airport retail space, demonstrating its relevant geographic market exceeds the bounds of one airport.  Host's proposed relevant geographic market forecloses its antitrust claims.

Our ruling here is consistent with the Seventh Circuit's relevant market analysis in Elliot v. United Ctr., 126 F.3d 1003 (7th Cir. 1997).  In Elliot, a peanut vendor outside the United Center, the home of the Chicago Bulls and Chicago Blackhawks, sued the stadium for its policy forbidding outside food, and identified the relevant market as "food concessions at the United Center." Id. at 1003-04.  In determining the United Center was not a relevant market, the Elliot court reasoned the stadium is an event venue that gains profit by limiting its concession options to "recoup the cost of putting on an event." Id. at 1005.  The court further rejected Elliot's logic by applying it to restaurants, asserting "Elliot's argument would mean that restaurants could no longer require customers to purchase their wines only at the establishment, because the restaurant would be 'monopolizing' the sale of wine within its interior." Id.  Finally, the court identified Elliot's actual relevant market as "all other comparable places in the Chicago area," and furthered even if all other similar venues enforced the same prohibition on outside food, there would still be no antitrust violation, absent collusion. Id.

We can impose Elliot's facts on this case and reach the same conclusion.  The Elliot court emphasized people go to the United Center to watch live sports, not to eat; just as people go to PHL to travel, not to buy soft drinks.  MarketPlace and PHL also raise revenue for operating its facilities through restricting concessions, a lawful practice the Elliot court permitted from the United Center. Def.'s Supp. Br., 11.  Host rebuts that stadiums and PHL are not similar markets because stadium

concessions are generally operated by a single concessionaire. Pl.'s Supp. Br., 14. This argument has no bearing on whether a venue is a relevant geographic market; but if it did, by Host's logic, stadiums are guilty of the same antitrust conduct by exclusively dealing with one concessionaire.[5] In Elliot and the instant case, both venues are smaller pieces of their actual relevant market, and although their plaintiffs may hurt from not participating in those smaller pieces, they can seek other places in the same market.

### C. Amendment of the Complaint Would Be Futile

Even if Host seeks to replead the proper relevant geographic market, the antitrust claims here will fail. Host has already acknowledged that it is a consumer in the worldwide market of airport concession space. To remedy the pleading deficiency here, Host would have to allege MarketPlace has enough power within the relevant market to force Host to buy the tying product and inhibit Host's ability to compete in the market. Queen City Pizza, Inc.,124 F.3d at 442; Lifewatch Services, Inc., 902 F.3d at 332. In this case, the relevant geographic market is the world, and, as Host concedes, MarketPlace does not have the global market power necessary to force Host to universally operate under its pouring rights provisions or to inhibit its participation in the global market. An amended pleading with the properly identified relevant geographic market would fail because despite this alleged antitrust injury—exclusion from PHL—Host can, and does, by its own admission, participate unencumbered in the global airport concessions market. As amending the complaint to reflect the

---

[5] In the context provided by Host, this would mean other concessionaires and vendors could bring antitrust claims against Philadelphia's Lincoln Financial Field for giving exclusivity rights to Aramark. Pl.'s Supp. Br., 15. While exclusive dealing agreements are not exempt from antitrust scrutiny, Race Tires America, Inc. v. Hoosier Racing Tire Corp., 614 F.3d 57, 76 (3d Cir. 2010), the Sherman Act "does not restrict the long recognized right of [a] trader…engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." Verizon Commc'ns, Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 408 (2004). Here, the pouring rights provision is the result of a request for proposal ("RFP") process in which PHL solicited offers from multiple soft drink companies and chose with whom they would deal, Oral Arg. Tr. 85:8-85:17, and Host does not allege any antitrust conduct in said RFP process.

proper relevant geographic market would be futile, the Court dismisses both antitrust claims with prejudice. See Alston v. Parker, 363 F.3d 229, 235 (3d Cir. 2004) ("If a complaint is vulnerable to 12(b)(6) dismissal, a District Court must permit a curative amendment, unless an amendment would be inequitable or futile.").

### D. Host's Tortious Interference Claim

After dismissing Plaintiff's antitrust claims, only a state law claim for tortious interference remains. Pursuant to 28 U.S.C.A. § 1367(c)(3), "a federal court may decline to exercise supplemental jurisdiction over state law claims when it dismisses all claims over which it has original jurisdiction." Doe v. Mercy Medical Center, 850 F.3d 545, 567 (3d Cir. 2017). Under the authority of 28 U.S.C.A. § 1367(c)(3), the Court declines to exercise supplemental jurisdiction and dismisses the tortious interference claim.

### IV. CONCLUSION

To establish antitrust standing, Host alleges that it is a consumer of airport concession space harmed by MarketPlace's pouring rights restrictions. However, as such a consumer, Host can and does shop in the global market for such space, not merely at PHL. Therefore, Host has failed as a matter of law to plead a relevant geographic market, as is necessary to support its antitrust claims.

For the foregoing reasons, the Court grants Defendant's Motion to Dismiss the Complaint with prejudice.

BY THE COURT:

*/s/ John M. Gallagher*      08/13/2020
JOHN M. GALLAGHER
United States District Court Judge